IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 12-cr-00258-WJM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

CHRISTIAN PAETSCH,

        Defendant.

---

**MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

---

      The defendant, Christian Paetsch, by and through undersigned counsel, Assistant Federal

Public Defender, Matthew K. Belcher, moves this Court to suppress all evidence obtained

subsequent to the illegal seizure and arrest of Mr. Paetsch including, but not limited to, the two

firearms, ammunition, bank band, clothing, license plates, and money seized from Mr. Paetsch's

white Ford Expedition, license plate 37FLCK, on June 2, 2012, as well as all statements made by

Mr. Paetsch subsequent to his illegal seizure and arrest on the grounds that they were obtained in

violation of his rights under the Fourth and Fifth Amendments to the United States Constitution.

In support thereof, Mr. Paetsch would show as follows:

## I.    FACTUAL BACKGROUND

      1.    *An armed robbery occurred at Wells Fargo Bank.*

      According to discovery provided thus far, on June 2, 2012 at approximately 3:45 p.m., the

Wells Fargo Bank located at 15301 East Hampden Avenue in Aurora, Colorado was robbed. A

single armed robber stole $25, 830 and escaped either on foot or by bicycle. The Aurora Police

were dispatched to the crime scene shortly thereafter. Witnesses could only offer a vague description of the robber whom they described as wearing a dark hoodie, gloves, a mask and sunglasses. The robber was armed with a handgun.

There was a "Sierra note" global positioning satellite ("GPS") in the bag of the stolen money that, once out of the bank, emitted signals communicating its location to the Aurora Police Department through designated computers in "real time."

The Aurora Police immediately sent out requests for police assistance. Aurora Police Dispatch tracked the GPS signal and radioed the signal's movements to the responding officers. The GPS tracker did not provide a pinpoint location of the stolen money, rather it appeared to give location information accurate to within approximately 30 feet. It also appeared that during surveillance, the tracker transmitted signals that varied in strength from weak to strong.  At one point, the tracker remained stationary, emitting signals from a residence located at 15781 East Greenwood Drive. The tracker then showed that the money was traveling eastbound on Iliff Avenue and stopped at the Iliff and South Buckley Road intersection. This led to a decision to block all eastbound traffic at Iliff/Buckley intersection at 3:49 p.m. It is unclear who issued the order to block the traffic, but it appears that Lieutenant Lertch was the supervising officer at the scene.

2.    *Officers initiate a dragnet seizure, barricading 20-25 cars at the Iliff/Buckley intersection in order to conduct a mass arrest.*

A perimeter was established blocking the eastbound lanes and officers were located at all four corners of the intersection. The officers left their police lights flashing and drew their weapons. Approximately 20-25 cars were contained within the barricade and held in the two left-

hand turning lanes of the intersection. While setting up the perimeter, officers mounted their guns

on the roofs of their patrol cars, aiming their guns directly at the passengers. The officers then

ordered everyone in custody to hold their hands outside of their car windows.  Drivers were

forced to hold their hands outside of their cars for up to an hour.  One woman reported that the

police would not allow her to put her car in park and she was forced to keep her foot on the brake

while her hands were displayed.  Additionally, no one was permitted to use their cell phone to

contact their families or use their hands to aid their young children seated in the back of their

cars.

By 4:30 p.m., there were over 30 officers who had responded to the scene. Lieutenant

Lertch worked with his sergeants, including Sergeant Matthew Brukbacher, on a plan to survey

the vehicles. The GPS tracker was not working well at the scene and the officers had no vehicle

information and very little suspect information. An arrest team was formed with the primary

goals to arrest every driver and search their vehicles while waiting for the FBI Safe Streets

investigator, Thomas Acierno, to arrive with the "ESP Currency Tracking Pack."  The "ESP"

tracker was capable of pinpointing the GPS signal. Investigator Acierno arrived at the scene at

approximately 4:40 p.m. Several cars were cleared and several individuals were arrested prior to

Acierno's arrival. It is believed that Mr. Paetsch was parked near the front of the line of cars and

was one of the first people arrested.

After Acierno arrived on the scene, he began scanning the cars with a handheld "ESP

Currency Tracking Pack." Simultaneously, the arrest team continued removing each individual

from their car, handcuffing them and placing them on the southern curb-line of Iliff Avenue.

Individuals being arrested were removed from their car at gunpoint and the officers guarding

3

those arrested kept their weapons drawn at all times. In total, the officers arrested approximately 40 men and women.  Some mothers with young children were permitted to stay in their cars with their children, uncuffed, while others were not.  Those children left in their cars, however, were not permitted to join their parents in the front seat or use the restroom.  At least one four-year-old girl was forced to urinate on herself while strapped in her car seat. Children as young as six years old were physically pushed by the officers towards the curb to be detained. Also, at least one African-American mother was arrested in front of her eleven-year-old son. The mother and son were driving home from a pool party, still dressed in their bathing suits, when the police barricaded the cars. When the arrest team reached their car, the officers ordered the mother to crawl out of the passenger-side door and then handcuffed her in front of her son. The two were both guarded on the curb.

After each occupant was arrested and removed to the curb, officers conducted preliminary plain-view searches of the cars and requested written consents to search each car. Officers looked through the heavily tinted windows of Mr. Paetsch's car at the time he was arrested.  Officers did not discover any evidence of the crime at the time they forcibly removed Mr. Paetsch from his Ford Expedition. Upon his arrest, Mr. Paetsch was kept in custody together with a group of several other passengers. The officers continued arresting the remaining occupants and searched the remaining cars after Mr. Paetsch's initial arrest.

3.      *Mr. Paetsch's arrest, the "ESP" tracker and the search of his white Ford Expedition.*

**a.      Mr. Paetsch's initial arrest.**

As described above, Mr. Paetsch was one of the first motorists taken into custody when the arrest team began surveying the cars.  About 45 minutes to an hour after all the cars were barricaded, officers removed Mr. Paetsch from his car at gunpoint and placed him in handcuffs. He and several other individuals were kept in custody with armed officers on the southeast curb of the road. After the preliminary plain-view searches were conducted, officers asked each handcuffed individual to sign written consent forms to search their cars. Officer Benedict asked Mr. Paetsch to consent to search his car. Mr. Paetsch refused and stated "I want to speak with my lawyer." At this point, Mr. Paetsch was not considered a suspect.

**b.      The "ESP" handheld tracker detected a signal from Mr. Paetsch's vehicle and officers claim to have discovered a $2000 bank band after he was arrested.**

Investigator Acierno arrived on the scene about one hour after the cars were seized and surrounded by armed law enforcement agents.  While the officers systematically arrested the passengers of the stopped vehicles, Acierno scanned the cars to detect the GPS signal with an "ESP Currency Tracking Pack."  Acierno received two weak signals from two different cars: (1) Mr. Paetsch's white Ford Expedition which was stopped in lane four of the roadway, approximately 50 yards from the intersection; and (2) from a car parked next to the Expedition.

After the weak signal was detected at Mr. Paetsch's car, officers claim they conducted a second plain-view search through Mr. Paetsch's heavily tinted windows and discovered a $2000 bank band or cash-strap lying on the front passenger seat of his car.  Acierno confirmed that he

5

saw the bank band.  At this point, Acierno requested that FBI Agent Patrick Williams join the

investigation because of his prior experience with the "ESP" tracker and Mr. Paetsch was

removed to the backseat of Officer Jensen's patrol car. He remained cuffed at all times.

FBI Agents Patrick Williams and Chris Langley arrive on-scene at an unknown time.

(Acierno initially began scanning vehicles sometime after 4:40 p.m.). Williams fine-tuned the

"ESP" tracker and began re-scanning all the cars. Williams then detected a strong signal from

only Mr. Paetsch's Expedition.

**c.      Officers searched Mr. Paetsch's vehicle without a valid consent to search.**

After the GPS signal is pinpointed to Mr. Paetsch's car, Officer Dediemar asked Mr.

Paetsch again to consent to search his car. This occurred while he was handcuffed in the back of

Officer Jensen's patrol car. Mr. Paetsch refused and stated "I told the officer that I did not want

anyone to look in my vehicle." Officer Dediemar continued to pressure Mr. Paetsch and,

eventually, Mr. Paetsch  submitted to his request. Officer Benedict removed Mr. Paetsch's

handcuffs so that he could sign the written consent to search form.  Shortly thereafter, Detective

Thrapp was notified by Sergeant Braunlich of the circumstances of Mr. Paetsch's consent and

that he had previously requested to speak to his attorney.  Agent Thrapp advised the officers on-

scene that Mr. Paetsch's consent waiver was, consequently, invalid.

The officers proceeded with the search on the basis of the bank band they claim was

discovered in plain-view after Mr. Paetsch was arrested. Just before the car search began, Mr.

Paetsch admitted that there were two firearms inside the car.  Officers Roberson and McDowell

performed the search. Agent Williams assisted.  The search yielded the discovery of:

6

(1)      $2,000 bank band on the front passenger seat;

(2)      small figure skating bag containing binoculars on the front passenger seat;

(3)      blue bag on the front passenger floorboard containing a .22-caliber firearm, sport coat, wig, gun holster, "disguise" kit, bald cap, unopened air-horn (packaged); empty air-horn package, black latex gloves;

(4)      black wallet with Mr. Paetsch's identification on the front passenger seat;

(5)      black iPhone and iPad on top of front center console;

(6)      gardening-style gloves inside center console;

(7)      Colorado car registration in glove box;

(8)      Two photocopied Colorado license plates in holders with plate number 600HAA in rear tailgate area;

(9)      black bag with camera in rear passenger-side seat;

(10)     grey/black bag containing safety deposit box key in rear passenger floorboard;

(11)     mail to Mr. Paetsch from Wells Fargo Bank under rear passenger seat;

(12)     white latex gloves in driver-side door;

(13)     checks for Jessica Paetsch for Wells Fargo Bank in driver-side door;

(14)     silver box with a loaded 9mm semi-automatic firearm , two separate loaded magazines, and additional boxes of ammunition in rear driver-side;

(15)     black shooting targets in rear of vehicle;

(16)     black latex gloves in rear of vehicle;

(17)     $22, 956.

After the car was searched, Officer Jensen took Mr. Paetsch to the Aurora Police

Department Jail at approximately 5:40 p.m. where he was booked. Officer Jensen later escorted

Mr. Paetsch to the Denver Jail for a U.S. Marshall hold, transferring custody at 10:30 p.m.

## II.    LAW AND ARGUMENT

"[T]he central concern of the Fourth Amendment is to protect liberty and privacy from arbitrary and oppressive interference by government officials." *United States v. Ortiz*, 422 U.S. 891, 895 (1975). A principle tenet of the Fourth Amendment is the requirement that searches and seizures are reasonable and ordinarily require warrants issued, based on probable cause. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989); *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976). Further, reasonable searches and seizures necessarily "limit[] police use of unnecessarily frightening or offensive methods of surveillance and investigation." *Ortiz*, 422 U.S. at 891; *see, e.g., Terry v. Ohio*, 392 U.S. 1, 16 (1968); *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 531 (1967); *Schmerber v. California*, 384 U.S. 757, 771-72 (1966).

Police and citizen encounters come in three varieties. The first involves the voluntary cooperation of a citizen in response to noncoercive questioning. *See United States v. Madrid*, 30 F.3d 1269, 1275 (10th Cir. 1994). The second is a *Terry*-stop, involving a brief, non-intrusive detention and frisk for weapons when officers have a reasonable suspicion that a person committed a crime or is about to do so. *See Terry*, 392 U.S. at 16. The third type of encounter is an arrest based upon either a warrant or probable cause. *See Madrid*, 30 F.3d at 1275.

Here, Mr. Paetsch was arrested after Aurora police officers barricaded his car at a major city intersection. A traffic stop is a "seizure within the meaning of the Fourth Amendment." *See, e.g., Delaware v. Prouse*, 440 U.S. 648, 653 (1979). *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001). Analogizing a traffic stop, the Tenth Circuit has held that courts should analyze such stops under *Terry*. *See id.* at 1266 (*citing United States v. Hunnicut*, 135 F.3d 1345,

1348 (10th Cir. 1998)). As a result, this Court must determine whether Mr. Paetsch's stop was

justified at its inception and "whether it was reasonably related in scope to the circumstances

which justified the interference in the first place." *Id.* (*quoting Terry*, 392 U.S. at 20).  This Court

must also consider whether the detaining officers had a ***particularized and objective basis*** for

suspecting legal wrongdoing.'" *United States v. Neff*, – F.3d ----, 2012 WL 1995064, slip op. *3

(10th Cir. June 5, 2012) (*quoting United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal

quotations omitted) (emphasis added). Under any review of the facts, Mr. Paetsch's seizure was

not based on individualized, reasonable suspicion and was therefore unjustified at its inception.

Nor was his resulting arrest based upon probable cause. Accordingly, all physical evidence seized

from Mr. Paetsch's car and his statements given at the scene must be suppressed.

> 1.   *Mr. Paetsch was stopped as part of a dragnet seizure for the police to*
> *conduct a mass arrest. The police officers had neither individualized*
> *reasonable suspicion to stop and detain  Mr. Paetsch's car nor probable*
> *cause to arrest him once detained.*

> a.   <u>The traffic stop was not supported by reasonable suspicion.</u>

In *United States v. Cortez*, 449 U.S. 411 (1981), the Supreme Court considered what

standard a police officer must satisfy in order to make a traffic stop.  The Court stated that there

must be a suspicion that the "***particular individual*** being stopped is engaged in wrongdoing." *Id.*

at 418 (emphasis added); "This demand for specificity in the information upon which the police

action is predicated is the central teaching of [the Supreme Court's] Fourth Amendment

jurisprudence."  *Id.*; *see, e.g.*,  *In re A.S.*, 614 A.2d 534, 540 (D.C. Cir. 1992) (The kind of

dragnet seizure of three youths who resembled a generalized description cannot be squared with

the long-standing requirement for particularized individualized suspicion."). Aurora police

9

officers had no reasonable suspicion that any *individual* driver, and specifically not Mr. Paetsch, was a suspect in the armed robbery when officers barricaded 25 cars and arrested up to 40 people at the Iliff/Buckley intersection. The only information that the police relied upon to conduct the barricade was the signal from the GPS tracker.

Critically, the GPS tracker was incapable of pinpointing the stolen money's location. While the signal provided officers with a general geographic location, officers had no identifying descriptions of either the robber or the getaway car that would narrow their investigation once the cars were detained. As a result, officers blindly stopped all cars at the intersection with the chief goal to indiscriminately arrest all passengers at gunpoint. While "*Terry* accepts the risk that officers may stop innocent people," *Illinois v. Wardlow*, 528 U.S. 119, 126, (2000), "[t]he articulated factors together ***must serve to eliminate a substantial portion of innocent travelers*** before the requirement of reasonable suspicion will be satisfied." *United States v. Brugal*, 209 F.3d 353, 359 (4th Cir.2000) (en banc) (emphasis added); *see also United States v. Dell*, 2012 WL 2443416, slip op. *5 (10th Cir. June 28, 2012) ("[A]lthough *Terry* in some circumstances allows the police to briefly detain individuals without probable cause for an arrest, '*any* curtailment of a person's liberty by the police must be supported by at least a reasonable and articulable suspicion that the ***person seized*** is engaged in criminal activity.'") (*quoting Reid v. Georgia*, 448 U.S. 438, 440 (1980) (emphasis added).

> b.     Mr. Paetsch's arrest was not supported by probable cause.

Law enforcement must either have an arrest warrant or possess probable cause to arrest an individual. *See Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008). "Probable cause to arrest exists where, under the totality of the circumstances, a reasonable person would believe that an

*offense has been committed by the person arrested*." *United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010) (internal quotation marks omitted) (emphasis added). The probable cause inquiry is an objective one. Additionally, arrests are characterized by the intrusive or lengthy nature of the detention. *See Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). A detention ceases to be a *Terry* stop and becomes an arrest if it continues for an excessive time period or closely resembles a traditional arrest. *Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 186 (2004); *see also United States v. Shareef*, 100 F.3d 1491, 1507 (10th Cir.1996) ( "an unreasonable level of force transforms a *Terry* detention into an arrest requiring probable cause").

Here, after officers barricaded all the cars within the armed Iliff/Buckley perimeter, the arrest team stopped at each car and: (1) removed all passengers at gunpoint; (2) handcuffed each passenger; (3) kept them under guard; and (4) detained the passengers for at least two and half hours. Mr. Paetsch was one of the first individuals arrested. He was arrested before FBI Agent Acierno arrived and employed the handheld tracking device to scan the cars and locate the signal.

 Further, if particularized suspicion is required for a traffic stop, and traffic stops are considered "less stringent" than the probable cause standard, then surely particularized suspicion must also be required to satisfy the more demanding test of probable cause for arrests. *See United States v. Wai-Keung*, 115 F.3d 874, 879 (11th Cir. 1997). Again, the barricade and each arrest, including Mr. Paetsch's, were based solely on the GPS tracking signal that dispatch was following at headquarters. The police had no identifying information at the time Mr. Paetsch and the rest of the passengers were taken into custody. The only "tip" the officers had was the general location of the stolen money. That information, alone, did not empower the officers with

11

excessive discretion to stop, search and arrest a large numbers of citizens. *See*, *e.g.*, *Sibron v. New York*, 392 U.S. 40. 62, 88 (1968) (stating that no probable cause could exist to arrest where an officer had no information concerning the defendant, saw the defendant talking to a number of known drug addicts for several hours, and could not hear what the defendant was saying to the addicts); *Davis v. Mississippi*, 394 U.S. 721 (1969) (dragnet detention and fingerprinting of black men fitting general description of perpetrator of crime held to violate the Fourth Amendment).

2.        *The police barricade was not a constitutional roadblock.*

Roadblocks that are properly tailored to detect evidence of a particular criminal wrongdoing rather than for general crime control are not *per se* unconstitutional and may be permissible even absent individualized suspicion. *See Illinois v. Lidster*, 540 U.S. 419, 424 (2004); *see also City of Indianapolis v. Edmond*, 531 U.S. 32 (2000). In *Carroll v. United States*, 267 U.S. 132, 154 (1925), however, the Supreme Court stated, "those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless ***there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.***" *Id.* at 44 (emphasis added).

In *Brown v. Texas*, 443 U.S. 47 (1979), the Supreme Court determined that "the Fourth Amendment requires that a seizure must [either] be based on ***specific, objective*** facts indicating that society's legitimate interests require the seizure of the ***particular*** individual" or be performed pursuant to a plan embodying neutral limitations. *Id.* at 51 (emphasis added); *see also Prouse*, 440 U.S. at 662 (stating that checkpoint inspections when not undertaken pursuant to previously specified neutral criteria, must be accompanied by ***individualized***, articulable

12

suspicion.). Given that the officers had no reasonable, individualized suspicion that would apply to any particular driver at the time the motorists were stopped, the roadblock must meet the requirements of a neutral public policy plan. The Iliff/Buckley police barricade does not.

The hallmark of a constitutionally permissible roadblock or checkpoint is it is less intrusive than a traditional arrest. Typically, appropriately tailored roadblocks are those where: (1) the primary law enforcement purpose is not to determine whether a vehicle's occupants are committing a crime; (2) there are notifications to the drivers that they are entering a roadblock or checkpoint where they will be detained; (3) drivers are able to avoid the roadblock or checkpoint; and (4) the stops and searches are brief in time and minimally intrusive. *See*, *e.g. Lidster*, 540 U.S. at 889 (brief stops of motorists at highway checkpoint at which police sought information about a recent fatal hit-and-run accident on that highway were not presumptively invalid under the Fourth Amendment); *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 452 (1990) (state's use of a highway sobriety checkpoint did not *per se* violate the Fourth Amendment). In *Sitz*, which considered the validity of a sobriety checkpoint, the Supreme Court specifically noted that the issue of  whether any individual was treated unreasonably after they were detained was not before the Court, but observed that individual detention of any particular motorists may "require satisfaction of an individualized suspicion standard." *See Sitz*, 496 U.S. at 450-51 (relying on *United States v. Martinez-Fuerte*, 428 U.S. 543, 567 (1976).

In assessing the reasonableness of a police checkpoint, Courts are directed to apply the three-pronged balancing test outlined in *Brown v. Texas*: "'(1) the gravity of the public concerns served by the seizure; (2) the degree to which the seizure advances the public interest; and (3) the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. at 50-51.

13

Admittedly, law enforcement and the citizens of Aurora had a substantial interest in apprehending the armed robber and the money stolen from Wells Fargo.  However, the manner in which Aurora Police Department pursued capturing the suspect was not narrowly tailored and the objective intrusion on these motorists' civil liberties was anything but minimal and brief.

First, *Terry* generally requires that law enforcement must use the least offensive procedure which will thwart the danger giving rise to the need for the procedure in the first instance. That is, in this instance, the implementation of the roadblock could be no greater than what was reasonably necessary to locate the GPS tracking signal or the stolen money. Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.7 (2011); *Terry*, 392 U.S. at 20  (intrusions must be "reasonably related in scope to the circumstances which justified the interference in the first place").  Given that the "basic purpose" of the Fourth Amendment is to safeguard individuals from "arbitrary invasions" by law enforcement, *Camara*, 387 U.S. at 528, it is important that this Court examine the manner in which the motorists caught by the barricade were selected and narrowed.

The GPS tracker did signal a general geographic location for the stolen money. What the signal did not do, however, was offer a pinpoint location, any description of the vehicle or driver of the car, or even necessarily imply that the armed robber was driving with the money. The strength of the signal varied as dispatch monitored its movements and the officers had no assurances that the signal was necessarily accurate at the time of the stop. The officers lacked even a generalized description of the suspect or getaway car. Consequently, the police were keenly aware that they were blindly and arbitrarily detaining a large number of people in deciding to barricade the cars at the Iliff/Buckley intersection. The officers were closely monitoring the

signal and had close to 30 police officers investigating the crime at the time. There was no objective reason that the officers could not continue monitoring the GPS tracker until the vehicle carrying the signal was identified or the suspected vehicles were narrowed so that the number of individuals that would be seized at a traffic stop or roadblock was limited.

More significantly, by any measure, the intrusion on the motorists' individual liberties in this barricade was severe and extensive. Mr. Paestch and the occupants of the vehicles were not required to wait "a very few minutes at most," have police contact for "only a few seconds" that consisted "simply of a request for information." *Lidster*, 540 U.S. at 427-28. The manner by which these motorists were shut in by the officers could not have been more terrifying. Police officers blocked the road and set up a perimeter with their guns mounted on top of patrol cars and aimed directly at all of the passengers. An arrest team surveyed each car and removed each occupant at gunpoint, placed them in handcuffs and took them into custody. All arrested passengers, including their children, were guarded by officers brandishing weapons. The flagrant misconduct by these officers is inexcusable. Dozens of individuals' lives were threatened by these officers based solely on the GPS tracking signal. Accordingly, this police barricade far exceeded any exceptions that less intrusive roadblocks or checkpoints provide officers to detain individuals.

3. *Mr. Paetsch's subsequent consent to search and any custodial statements are tainted by the preceding 4th Amendment violations and must be suppressed*

Whether a consensual consent to search preceded by a Fourth Amendment violation is sufficiently an act of free will to purge the primary taint of the illegal arrest depends upon whether it is voluntary in fact, which in turn depends upon the totality of circumstances

surrounding the consent.  *United States v. Guzman*, 864 F.2d 1512, 1520-21 (10th Cir. 1988)

(citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973).  In applying the *Schneckloth*

voluntariness test to consents to search obtained subsequent to Fourth Amendment violations, the

Tenth Circuit has considered the three factors articulated in *Brown v. Illinois*, 422 U.S. 590

(1975), which also apply to custodial statements and confessions.  These factors include: (1) the

temporal proximity of the arrest and the confession; (2) the presence of intervening

circumstances; and particularly (3) the purpose and flagrancy of the official misconduct.  *Id*. at

603-04.

Here, the officers' illegal seizure of Mr. Paetsch without any particular, individualized

suspicion that he had, was, or was about to commit a crime, followed closely by the illegal arrest

of Mr. Paetsch without a warrant or probable cause to believe he had committed a crime, were

temporally proximate in time to Mr. Paetsch's written consent to search the vehicle and

subsequent custodial statements  –  separated at most by an hour, possibly less.  Additionally,

during the limited amount of time elapsing between the illegal seizure, arrest, and written

consent, no intervening circumstances occurred that could have possibly dissipated the taint of

the 4th Amendment violations.  Furthermore, the purpose and flagrancy of the officers' violations

dramatically increase the taint flowing from the Fourth Amendment violations.  The arresting

officers' purposely barricaded in, then surrounded Mr. Paetsch and the additional 40 or so

individuals within the armed perimeter for the sole purpose of arresting each and every individual

without a warrant or probable cause.  One by one, each individual, including Mr. Paetsch, were

forced at gun point from their vehicles, handcuffed, and placed on the street curb under the watch

of armed police officers.  All of this occurred before the officers' questioned Mr. Paetsch as to

16

consent to search his vehicle and the contents of his vehicle.

Mr. Paetsch's written consent to search his vehicle and his custodial statements made in response to police questioning was obtained immediately after his warrantless, unconstitutional seizure and arrest, no intervening circumstances took place to dissipate the taint of these 4th Amendment violations, and the purpose and flagrancy of the officers' violations were such to warrant the conclusion that the consent and subsequent custodial statements are tainted and, therefore, must be suppressed.

> 4.     *Mr. Paetsch's subsequent consent to search and custodial statements were also obtained in violation of the 5th Amendment and must be suppressed*

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." In *United States v. Edwards*, 451 U.S. 477, 484-85 (1981), the Supreme Court added a second layer of prophylaxis to the *Miranda* rule, holding that a suspect who has "expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication."

A person is considered "in custody" for the purposes of *Miranda* and *Edwards* if the individual "has been deprived of his freedom of action in any significant way," *Miranda*, 384 U.S. at 444, or his freedom of action has been curtailed to a "degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). Thus, "[t]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *United*

17

*States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir. 1994).

Here, prior to his written consent to search his vehicle and subsequent custodial statements, Mr. Paetsch had been forcibly removed from his vehicle at gun point, handcuffed, and placed on the street curb under the careful watch of armed law enforcement agents.  A reasonable person in Mr. Paetsch's shoes would not have felt that he was free to leave. Furthermore, after being asked for his consent to search his vehicle, Mr. Paetsch unequivocally refused and stated, "I want to speak with my lawyer."  Despite this unequivocal *Edwards* request to speak with his lawyer prior to any further interaction with law enforcement, Mr. Paetsch was moved from the street curb to the back of a police cruiser and once again asked for his consent to search his vehicle.  Mr. Paetsch refused once again.  Not taking no for an answer, officers' continued to pressure Mr. Paetsch while in custody, handcuffed, and in the back of a police cruiser.  Eventually, Mr. Paetsch acquiesced to the continued pressure being applied by law enforcement and signed a "voluntary" written consent to search his vehicle.  Additionally, Mr. Paetsch was questioned by law enforcement as to the contents of the vehicle – in particularly whether or not there were firearms located within his vehicle.  In response, Mr. Paetsch indicated that there were two loaded guns in his vehicle.

FBI Agent Thrapp was on scene and was immediately informed that Mr. Paetsch had executed a written consent to search his vehicle.  At that very moment, Agent Thrapp was also informed by Sergeant Braunlich as to the circumstances underlying the continued attempts to obtain a valid waiver to search the vehicle, including the fact that Mr. Paetsch had unequivocally requested counsel when first asked to provide consent.  Based on this information, Agent Thrapp decided that the written consent to search was invalid and did not proceed upon this legal basis to

18

justify the ultimate search of the vehicle.

Mr. Paetsch was forcibly seized and arrested at gunpoint, placed in handcuffs, and ultimately secured in the back of a police cruiser. No reasonable man would believe at that point that he was free to leave and, thus, Mr. Paetsch was in custody for purposes of *Miranda* and *Edwards*. While not in response, or subsequent to, his being read the *Miranda* rights[1], Mr. Paetsch, nonetheless, clearly and unequivocally requested that he be allowed to speak with a lawyer prior to any further interaction with law enforcement. Accordingly, the continued questioning and pressure exerted by law enforcement subsequent to his unequivocal request, and prior to being given access to an attorney, is in violation of his 5th Amendment rights, as explained by *Miranda* and *Edwards*, and must be suppressed.

### III.    CONCLUSION

Because the illegal arrest and warrantless search of Mr. Paetsch's car cannot be justified, all evidence obtained as a result of that search must be suppressed. Further, all statements, including but not limited to Mr. Paetsch's statements with respect to the search and the firearms were taken after the unjustified warrantless seizure and arrest and therefore, directly derived from the illegal arrest. Because there was no intervening event to sufficiently purge the taint, these statements must also be suppressed. *Wong Sun v. United States*, 371 U.S. 471 (1963); *Brown v. Illinois*, 422 U.S. 590 (1975). In addition to the many 4th Amendment violations, Mr. Paetsch's consent to search, as well as his custodial statements, were obtained subsequent to his

---

[1] From the discovery provided thus far, it does not appear that Mr. Paetsch was read his *Miranda* rights prior to the consent to search his vehicle or the questioning by law enforcement concerning the contents of his vehicle.

unequivocal *Edwards* request for counsel and, therefore, must be suppressed on these grounds as well.

Respectfully submitted,

RAYMOND P. MOORE
Federal Public Defender


s/ Matthew K. Belcher
Matthew K. Belcher
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Matthew.Belcher@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

David Conner, Assistant United States Attorney
dave.conner@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Christian Paetsch, Defendant
(via mail)

s/ Matthew K. Belcher
Matthew K. Belcher
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Matthew.Belcher@fd.org
Attorney for Defendant