**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Action No. 12-cr-00258-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

CHRISTIAN PAETSCH,

      Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO SUPPRESS**

---

In this action, Defendant Christian Paetsch is charged in Count 1 of the

Indictment with bank robbery, and use of a dangerous weapon in the commission of a

bank robbery, in violation of 18 U.S.C. § 2113(a) & (d), respectively; and in Count 2 with

use of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).

(ECF No. 6.)

This matter is before the Court on Defendant's Motion to Suppress Evidence and

Statements ("Motion" or "Motion to Suppress").  (ECF No. 16.)  In the Motion, Defendant

seeks suppression of all evidence obtained during the course of a traffic stop shortly

following the bank robbery.  (*Id.*)  The Government has filed a Response to the Motion

(ECF No. 18), and Defendant has filed a Reply (ECF No. 19).

Over the course of three days, the Court held an evidentiary hearing on the

Motion.  (ECF No. 26-28.)  Both parties were (well) represented at the hearing by

counsel, and were given a full opportunity to present witness testimony.  (*See also* ECF

No. 22.)  All told, sixteen witnesses testified over the course of the three-day hearing:  a teller at the bank that was robbed, thirteen police officers involved in the traffic stop, and two civilians stopped in the traffic stop.  Defendant did not testify.  The Court also held oral argument on the Motion to Suppress at the close of evidence.

After carefully considering the evidence presented at the hearing, counsel's arguments in their briefs and at the hearing, and the applicable law, the Court GRANTS IN PART and DENIES IN PART the Motion to Suppress.

## I.  BACKGROUND

The underlying material facts are undisputed.  Specifically, the testimony provided by all of the various witnesses at the evidentiary hearing – both the Government's witnesses and Defendant's witnesses, and their testimony both on direct and cross examination – was consistent regarding the material facts.  The Court finds that the testimony of all of the witnesses was generally credible, both because there were few inconsistencies in their testimony,[1] and because of the witnesses' demeanor during their testimony.  *See United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009) (at a suppression hearing, "[t]he credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court").  The key question is, given the undisputed material facts, were the police

---

[1] That makes this case different from a case in which the testimony of two or more witnesses directly conflict regarding crucial facts, in which case the lack of credibility of one or more witnesses is clearer, and credibility determinations can be of the utmost importance.

Notably, Defendant's counsel, in his cross-examination of the police officers at the hearing, did not appear to attempt to impeach the officers' credibility, but instead simply sought to elicit what counsel believed to be the facts favorable to Defendant's case, for example, facts regarding the invasiveness and duration of the traffic stop.

officers' actions reasonable under the governing case law.  The evidence presented at the hearing, and accepted as true by the Court, indicates the following:

At approximately 3:47 p.m. on June 2, 2012 (a Saturday), the Wells Fargo Bank branch located at the corner of South Chambers Road and East Hampden Avenue in Aurora, Colorado was robbed.  The robber entered the bank, holding a handgun in one hand and an air horn in the other, and yelled for everyone to get down on the floor.[2] The robber was covered "head-to-toe" in clothing, including his face and hands.  The robber scooped stacks of money out of the tellers' drawers, and left the bank.  The evidence suggests the robber left the area either on foot or on a bicycle.

Presumably unbeknownst to the robber, a global positioning system ("GPS") tracking device was embedded in one of the stolen stacks of money.  The system was set up such that shortly after the GPS tracking device was removed from the teller's drawer, it sent a signal via satellite to the Aurora Police Department ("APD"), where it could be tracked on a map on an APD computer monitor.[3]  The location of the GPS tracking device, as shown on the APD computer monitor, was accurate to within an approximate 30-foot radius.  Based on the location of the GPS tracking device, APD dispatchers began relaying the tracking device's location via radio to police officers in the field, along with other updates.  Dispatchers also began compiling an Incident Recall

---

[2] There were six or seven bank tellers in the bank at the time, as well as an unknown number of customers.

[3] Every 6-10 seconds the GPS tracking device sent a "ping" off the satellite, which would mark a dot on the map on the APD's computer monitor.  (Thus, how far apart the dots were on the map indicated the approximate speed that the device was moving.)  Also, the dots showing up on the computer screen were only delayed approximately 5-13 seconds behind the live location of the tracking device.

Log ("IRL") of these updates, which could be viewed by officers on screens in their patrol cars.

At 3:50 p.m., the first update was broadcast to officers regarding the tracking device's location.  Between 3:52 p.m. and 3:55 p.m., the tracking device appeared to be stopped at a residence on Greenwood Drive in Aurora, approximately a half-mile from the bank.  At 3:55 p.m., the tracking device began moving again, away from that residence.  The Court questioned Detective Michael Thrapp at the hearing regarding why officers did not intercept the robber when he was stopped on Greenwood Drive. Detective Thrapp credibly responded that it was simply impossible for officers to get to that location in time, given how dispersed officers generally are within Aurora, how recently the robbery had occurred, and that the tracking device was stationary for only three minutes.

A couple of asides are necessary to point out.  First, officers had only a very vague description of the robber of the bank, such that they did not even definitively know if the robber was male.  Immediately following the robbery, Kathleen Smith, a teller at the bank, telephoned 9-1-1 and could only report that, based only on the sound of the robber's voice, she thought the robber was male, and provided best estimates that the robber was Caucasian and in his 20s or 30s.  Second, officers were on notice that devices called handheld "beacons" existed that could be brought to a particular scene to much more accurately identify the precise location of a GPS tracking device embedded in a stack of stolen money, to within approximately five feet.  Early in the APD's monitoring of the tracking device's location, dispatchers were reporting to officers that at least one such handheld beacon was available in the Denver metropolitan area.

After the tracking device began moving again, police dispatchers began reporting that the tracking device was now moving at speeds of 30-40 miles per hour, indicating that the tracking device was now inside an automobile.[4]  Dispatchers reported that the tracking device was traveling northbound on Chambers Road towards East Iliff Avenue, and that the tracking device then turned right onto Iliff Avenue, traveling eastbound towards the next major intersection of Iliff and Buckley Road.

As the tracking device moved eastbound on Iliff Avenue, APD Officer Kristopher McDowell was traveling westbound on Iliff, hearing dispatch reports that the tracking device was coming towards him, and then that the tracking device had passed his location.  Officer McDowell took a u-turn and began following the signal.  McDowell then heard from dispatch that the signal was stopped at the corner of Iliff Avenue and Buckley Road.  He approached the intersection, saw a group of vehicles stopped at the intersection at a red light, and heard another dispatch that the signal was still stopped at the corner.  McDowell noticed that the light was about to turn green, and had only a second or two within which to decide whether or not to stop traffic at that intersection at that time.  At 4:01 p.m., approximately 14 minutes after the bank robbery, Officer McDowell pulled his patrol car around and in front of the group of twenty vehicles stopped at the red light, got out of his patrol car, and motioned with his hands for the vehicles to remain stopped.  Again, at that time, officers had no information regarding which of the twenty vehicles belonged to the bank robber, and also had little information regarding what the robber looked like.

_____

[4] This information alone, obviously, gave officers no indication regarding what type of vehicle was carrying the GPS tracking device.

Within a very short period of time, other patrol cars from the Aurora, Colorado Police Department arrived on the scene, physically blocking the twenty civilian vehicles within the perimeter formed by their patrol cars.  At this time a large number of bystanders began to gather in front of commercial establishments adjacent or very near to the intersection in question to watch the events unfold.  Over a public address ("PA") system, individuals in the twenty vehicles were ordered to put their hands up (and out of their car windows if possible), and not to move.[5]  Evidence indicates that approximately twenty-nine people were within the twenty stopped vehicles.  Officers had their weapons pointed toward the group of twenty vehicles, and no one within the twenty vehicles was free to leave.  Further reports from dispatch indicated that the tracking device was still stationary at the corner of Iliff Avenue and Buckley Road.[6]

At 4:08 p.m., APD Lieutenant Christen Lertch arrived on the scene, and became the commanding officer from that point forward.  Lieutenant Lertch testified that officers were faced with a unique situation, because in other similar cases, officers typically had more information regarding the suspect's vehicle or physical appearance.  Lertch testified that the threat posed by a dangerous, armed criminal being anywhere within

---

[5] They were not told why they were being stopped; Officer Alfred Roberson testified that giving them that information could have led the bank robber to attempt to escape in a shootout.

[6] There were a couple instances where the tracking device appeared to "jump" to a slightly different location on the APD computer monitor.  However, this was a known issue with such tracking devices, because after certain periods the signal needs to move from one satellite to another due to the curvature of the Earth, and thus shows a slightly inaccurate location for a very short period of time.  After those few "jumps," the signal went back to its consistent location of being stationary at the corner of Iliff and Buckley.

this group of twenty vehicles made safety concerns increase exponentially.  He also testified that he considered whether to let the cars go, and then to try to continue to monitor the movements of the tracking device, but decided against that course of action because of the significant risk that a high-speed chase would ensue, putting his officers and members of the public at significant risk of harm.  Lieutenant Lertch also testified that, in weighing the risks involved, he determined that the appropriate course was to contain the scene, to "slow it down," and to implement APD-approved operational tactics to keep everyone "safe and alive."

Lieutenant Lertch also requested of the APD dispatch that a handheld beacon be brought to the scene as soon as possible.  Lertch was advised by dispatch that an Investigator with the Federal Bureau of Investigation's Rocky Mountain Safe Streets Task Force ("FBI Task Force") would be arriving on the scene within 20-30 minutes. After that amount of time had passed, Lertch requested an update, and was told that it would be another 20-30 minutes.  At that time, Lertch requested to speak to the FBI Task Force Investigator directly.  FBI Task Force Investigator T.J. Acierno telephoned Lertch and told Lertch that Acierno was on I-70 near Quebec Avenue (approximately 13 miles from the scene).  Lertch impressed upon Acierno the importance of getting to the scene as quickly as possible.

Acierno had been off-duty at his home in Broomfield, Colorado – approximately 30 miles from the scene – when he had received the alert regarding the bank robbery and the GPS tracking device being taken.  After hearing this alert, Acierno had to first travel to the FBI Task Force office in northwest Denver to pick up the handheld beacon. While en route, Acierno also notified FBI Task Force Officer Patrick Williams regarding

the situation, and Williams also began making his way to the scene from his home in Firestone, Colorado (approximately 45 miles from the scene).

Prior to Investigator Acierno's arrival, at approximately 4:30, occupants of three of the twenty vehicles were removed from their vehicles. During the entire event, officers had been training their eyes on the vehicles' occupants, looking for any suspicious activity or movement within the vehicles. In two of the three vehicles at the back of the group of twenty cars, officers had noted suspicious activity. Specifically, Officer Jordan Odneal noticed a male in a white Ford Expedition ("SUV") acting suspiciously, moving around in his seat, and looking around a lot. At one point, the individual in the SUV also pulled his hands inside the vehicle, after having them outside the vehicle as ordered. Lieutenant Lertch ordered that that individual be removed from his SUV. That individual was Defendant.

A group of four officers formed a team to conduct a "high-risk traffic stop." The officers approached the SUV from the back, with weapons drawn and deploying ballistic shields. They ordered Defendant to get out of the vehicle and lay down on the ground. Officers approached him, handcuffed him, and brought him into what Lieutenant Lertch described as "protective custody," sitting on the curb a distance away from the vehicles to the west (behind the vehicles). The officers did the same with the other vehicle in which the driver was acting suspiciously, which was directly behind Defendant's SUV. The driver of the third vehicle was removed for tactical reasons.[7] After those three

_____

[7] An officer testified that the occupant of the third vehicle, which was next to Defendant's SUV, was removed in order to entirely clear the back two rows of vehicles, to keep all of the remaining potential threats in one area.

individuals were removed from their vehicles, Lieutenant Lertch ordered officers to await further orders until the handheld beacon arrived on scene.

During the time the occupants of the three vehicles were detained on the curb, an Officer Benedict, who was in charge of guarding those individuals, asked the individuals for consent to search their vehicles.  When Defendant was asked, Defendant told Officer Benedict that Defendant wanted to speak with his lawyer.  After Officer Benedict explained to Defendant that he was not a suspect yet, and that consent to search was voluntary, Defendant repeated that he wanted to speak to his lawyer.  According to Officer Benedict, he informed, among others, Sergeant Kenneth Braunlich of the fact that Defendant had requested to speak to his attorney.

Investigator Acierno finally arrived on the scene at Iliff Avenue and Buckley Road at 4:55 p.m. (approximately 54 minutes after the initial stop).  Upon his arrival, Acierno began walking with the handheld beacon around and between the twenty vehicles, attempting to determine in which vehicle the tracking device was located.  He got only a weak signal from Defendant's SUV, and did not get a signal from any of the other vehicles.  He was, however, not confident in his ability to use the beacon properly, given how infrequently he had been asked to employ this equipment in the past.  Defendant Thrapp had testified that there were 6-8 officers in the FBI Task Force who had been trained on the use of the beacon (Officer Acierno being one of them), but that only two of them were experts in the use of the beacon, one of them being Officer Patrick Williams, who was en route.

Once Lieutenant Lertch learned of Investigator Acierno's lack of confidence using the device, and his inability to get a strong signal from any vehicle, Lertch decided to

have the occupants of the remaining seventeen cars removed from their vehicles.  The same high-risk traffic stop techniques were used on the remaining vehicles, with officers approaching the cars from behind in teams with weapons drawn.  Several guidelines appear to have been followed, at least for the most part.  No children were handcuffed.  For any vehicles containing "full families" – a male, female, and children – the adults in those vehicles were not considered suspects, and were not handcuffed.[8]  Adults traveling alone or with another adult were considered suspects for the time being, and were handcuffed.[9]  At least in some cases, officers pointed their weapons directly at adults being removed.  All of these individuals were also brought to the back of the group of stopped cars, and seated on the sidewalk with the original three detainees.  All individuals were removed from their vehicles by approximately 5:25 p.m.

Officers then conducted a "secondary search" of the vehicles, walking along the outside of vehicles and looking through car windows to verify that there was no one else hiding within any of the vehicles.  During this secondary search, at approximately 5:28 p.m., Officer Alfred Roberson broadcast over his radio that he had located a piece of evidence in the front passenger seat of Defendant's SUV.  Specifically, through the closed front passenger side window, Roberson saw a $2,000 bank "money band," a slip of colored paper from banks that wraps around a stack of bills.  Lieutenant Lertch went

---

[8] In the case of Sommer Carter, a woman who was traveling with her eleven-year-old son, she was handcuffed for a brief period of time after being removed from her vehicle.

[9] Officer Alfred Roberson testified that it was assumed that the suspect could have picked up someone else prior to being stopped at the traffic stop.  Indeed, the tracking device had been reported as stopped at a residence on Greenwood Drive.

over to Defendant's SUV, and also witnessed the money band through the window of the SUV.  Several other officers also witnessed the bank money band.

Shortly after the officers observed the money band in Defendant's SUV, Trooper Patrick Williams, an expert in the use of the handheld beacon, arrived on the scene. After using the beacon for a short period of time, Williams got a "very strong" signal on the beacon that the tracking device was located within Defendant's SUV.  Trooper Williams informed Lieutenant Lertch of this fact.  At that point, Lieutenant Lertch directed that Defendant be placed in the back of a police car.  The other detainees were then released and allowed to leave the scene in their vehicles, and traffic was resumed in all directions through the intersection of Iliff Avenue and Buckley Road.

At some point after Defendant was put in the back of a patrol car, Sergeant Braunlich went to speak with him.  Sergeant Braunlich asked Defendant if any officers had asked him for consent to search his vehicle, and Defendant responded yes, but that he had told the officer that he did not want anyone to search his vehicle.  According to Sergeant Braunlich, the Sergeant then told Defendant something to the effect of "Sir, you are not under arrest, pending the outcome of our investigation.  This is a very serious investigation. Your cooperation would be appreciated."  According to Sergeant Braunlich, Defendant, after some hesitation, eventually gave consent to search his vehicle.  A short time later, Sergeant Braunlich also asked Defendant if he had any firearms in the vehicle.  Defendant responded something to the effect of, "Yes, I have a Glock and a Walther handgun inside the vehicle."

Ultimately, Defendant's SUV was searched.  Officers Roberson and McDowell conducted the search, with Crime Scene Investigator Harrell taking photographs of the

11

evidence found.  Among other evidence, the following was found in Defendant's SUV:

currency totaling $22,956.00, a loaded handgun within reach of the driver's seat,

another loaded handgun in the back of the car, additional boxes of ammunition, a mask,

a wig, a pair of gloves, an empty air horn package, two fake license plates, and the GPS

tracking device in one of the stacks of money.  Trooper Williams turned off the tracking

device, and dispatch confirmed that the satellite signal of the tracking device that

dispatch had been following had become deactivated.

## II.  BURDEN OF PROOF

It is undisputed that the officers did not have a warrant when they stopped traffic

or when they conducted the search of Defendant's SUV.  On a motion to suppress

evidence obtained during a warrantless search or seizure, the Government bears the

burden of proving the reasonableness of the search or seizure.  *See, e.g.*, *United States*

*v. Maestas*, 2 F.3d 1485, 1491 (10th Cir. 1993) ("As a general matter, if the search or

seizure was pursuant to a warrant, the defendant has the burden of proof; but if the

police acted without a warrant the burden of proof is on the prosecution. . . . [Thus,]

when the defendant challenges a warrantless search or seizure the government carries

the burden of justifying the agents' actions.") (internal quotations omitted).[10]  On the first

---

[10] There is some conflict in the Tenth Circuit case law on this point.  In fact, some cases appear to hold that the Government always bears the burden of proof on a motion to suppress, *see United States v. Kitchell*, 653 F.3d 1206, 1216 (10th Cir. 2011); *United States v. Chavez*, 534 F.3d 1338, 1343 (10th Cir. 2008); while other cases seem to hold that the defendant always bears the burden of proof, *United States v. Moore*, 22 F.3d 241, 243 (10th Cir. 1994); *United States v. Betancur*, 24 F.3d 73, 77 (10th Cir. 1994).  Other cases, like *Maestas*, hold that the question depends on whether or not the search or seizure was conducted pursuant to a warrant.  *See also United States v. Herrera*, 444 F.3d 1238, 1242 (10th Cir. 2006); *United States v. Bute*, 43 F.3d 531, 534 (10th Cir. 1994); *United States v. Finefrock*, 668 F.2d 1168, 1170 (10th Cir. 1982).

day of the evidentiary hearing, the Government conceded that it had the burden of proof

on the issues raised in the Motion.  Given this concession and the supporting case law,

the Court holds that the Government has the burden here of proving the

reasonableness of the officers' actions in this case.

### III.  ANALYSIS

The Fourth Amendment to the U.S. Constitution provides, in relevant part, that

"[t]he right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures, shall not be violated."  However, "[t]he

Amendment says nothing about suppressing evidence obtained in violation of this

command.  That rule – the exclusionary rule – is a prudential doctrine created by this

Court to compel respect for the constitutional guaranty."  *Davis v. United States*, 131 S.

Ct. 2419, 2426 (2011).

### A.      The Initial Traffic Stop

In his Motion, Defendant first argues that the traffic stop was not supported by

reasonable suspicion that any one particular individual stopped at the intersection of Iliff

Avenue and Buckley Road had committed the bank robbery, and therefore the stop did

not comport with *Terry v. Ohio*, 392 U.S. 1 (1968) ("*Terry*"), and its progeny.  (ECF No.

16, at 8-10.)  Defendant also argues that the traffic stop was not a constitutional

roadblock under the governing case law[11] because the governmental interests in

effecting the stop were outweighed by the magnitude of the interference with the liberty

---

[11] *See, e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976); *Brown v. Texas*, 443 U.S. 47 (1979); *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444 (1990); *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000); *Illinois v. Lidster*, 540 U.S. 419 (2004).

of the twenty-nine stopped individuals detained at the subject intersection.  (*Id.* at 12-15.)  In response, the Government disagrees, arguing that the roadblock, although a "seizure" of all of the individuals stopped, was constitutional because it had a proper purpose and was implemented in a reasonable manner, given the exigent circumstances under which the law enforcement personnel involved were operating. (ECF No. 18, at 7-12.)

Cases in which an officer stops a pedestrian on foot or a motorist in a car are generally governed by *Terry* and its progeny.  Under that case law,

> [A] law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further. . . .  The officer's action must be justified at its inception, and reasonably related in scope to the circumstances which justified the interference in the first place.

*Hiibel v. Sixth Judicial District Court of Nev., Humboldt Cnty.*, 542 U.S. 177, 185-86 (2004) (citations, quotation marks, and ellipses omitted).  Such stops normally require not only reasonable suspicion, but also individualized suspicion.  *See United States v. Cortez*, 449 U.S. 411, 417 (1981).  As the Government appears to concede, at the time of the stop of the twenty vehicles, the officers did not have reasonable suspicion that Defendant in particular (or any other specific individual among the approximately 29 person detained) had committed the bank robbery.

However, although "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure[,] . . . the Fourth Amendment imposes no irreducible requirement of such suspicion."  *United States v. Martinez-Fuerte*, 428 U.S. 543, 560-61 (1976).  Instead, "[t]he touchstone of the Fourth Amendment is reasonableness, not individualized suspicion."  *Samson v. California*, 547 U.S. 843, 855

14

n.4 (2006).  Thus, "special law enforcement concerns will sometimes justify highway stops without individualized suspicion."  *Illinois v. Lidster*, 540 U.S. 419, 424 (2004) (citing *Mich. Dept. of State Police v. Sitz*, 496 U.S. 444 (1990) (upholding constitutionality of sobriety checkpoint), and *Martinez-Fuerte*, 428 U.S. 543 (upholding constitutionality of Border Patrol checkpoint)).  So, as the Supreme Court pointed out in *City of Indianapolis v. Edmond*, "the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up . . . to catch a dangerous criminal who is likely to flee by way of a particular route."  531 U.S. 32, 44 (2000).[12]  In determining the constitutionality of such a roadblock, "we look to 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'"  *Lidster*, 540 U.S. at 427 (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)).

Under the particular facts and circumstances of this case, the Court holds that the officers' initial stop of the twenty vehicles was reasonable, and therefore did not violate the Fourth Amendment.  Applying the statement of law cited immediately above from *Edmond*, the roadblock here was, without a doubt, designed "to catch a dangerous criminal . . . ."  *Edmond*, 531 U.S. at 44.  At the time the 20 vehicles were detained, the Aurora Police Department was seeking an armed individual whom they knew  had

---

[12] *See also United States v. Davis*, 143 F. Supp. 2d 1302, 1307 (M.D. Ala. 2001) ("[A] roadblock can be a blunt and sweeping and yet very intrusive tool that is essentially an exception to the fourth amendment's individualized probable-cause or suspicion-based determination, and thus must be justified by more evidence of a pressing and legitimate public need for it.  In other words, where probable cause for stopping any one vehicle is lower, the exigent circumstances necessary to justify it—that is, the gravity of public concern—must be greater.") (citation omitted).

robbed a bank with the use of a visible handgun, clearly designed to instill fear in the individuals in the bank, and creating the potential for a fatal shooting at the bank.  In the Court's view it was entirely reasonable for the officers to assume that the robber continued to be armed and dangerous, especially given the fact that the mass traffic stop was effected less than 15 minutes after the bank robbery itself had taken place.[13]

In addition, the dangerous criminal here was more than just "*likely* to flee by way of a particular route."  *Id.* (emphasis added).  Instead, the officers here had near certain information that the robber was within one of the twenty vehicles.  Specifically, the evidence presented at the hearing established the reliability and accuracy of the GPS tracking of the planted device to within a 30-foot radius.  The evidence also established that the device was tracked at speeds indicating that the device was within an automobile.  The evidence further established that Officer McDowell knew that the device was traveling eastbound on Iliff Avenue, and then contemporaneously (1) heard from dispatch that the tracking device had stopped at the corner of Iliff Avenue and Buckley Road, and (2) visually witnessed the group of vehicles stop eastbound on Iliff at the corner of Iliff Avenue and Buckley Road, making it a near certainty that the device was within the group of twenty vehicles.  And finally, although it is certainly possible that the bank robber might not be in the same location as the tracking device, that possibility was small and so the officers acted reasonably in assuming the bank robber was in one of the twenty vehicles.  Given that officers were attempting to catch a dangerous criminal, and

---

[13] Defense counsel elicited testimony at the hearing indicating that the officers knew that no shots had been fired at the bank and that no one had been injured.  That fact is inconsequential to the analysis here.  The mere fact that a bank was robbed at gunpoint made the suspect potentially very dangerous.

had fairly precise information regarding his location, the first two *Brown v. Texas* factors –
"the gravity of the public concerns served by the seizure" and "the degree to which the
seizure advances the public interest" – weigh heavily in favor of a finding that the initial
stop was reasonable.  *Lidster*, 540 U.S. at 427 (quoting *Brown*, 443 U.S. at 51).

One could argue that the officers instead should have continued tracking the
device in order to possibly narrow down the location of the device to a particular vehicle.
The Court rejects such an argument for several reasons.  First, evidence at the hearing
established that traffic was moderate-to-heavy at the time, and the area of Aurora
involved was a commercial/residential area.  Thus, unlike the tracking of a GPS device in
a rural area, for example, the Court is not convinced that officers would have been able to
narrow down the device's location to any one particular vehicle by following the signal for
a longer period of time.[14]  Second, numerous officers in different patrol cars were close to
the scene when traffic was stopped.  If officers had begun following the device,
particularly for an extended period, the chance that the robber would have realized he
was being followed would have increased significantly, very possibly leading to a high-
speed chase endangering the lives of the officers, innocent motorists, and pedestrians.
*See, e.g.*, *United States v. Thompson*, 393 F. App'x 852 (3d Cir. 2010) (case in which
officers followed a minivan suspected of containing a GPS tracking device embedded in a
stolen stack of money, and a high-speed chase ensued during which the minivan struck

---

[14] For example, under such urban conditions, certain cars could pull off a
particular roadway, but other cars could pull onto the same roadway.  This, in addition to
the diffuse accuracy of the GPS device to within a 30-foot radius, means that following
the signal longer and ultimately stopping traffic later at another intersection could still
likely result in the stop of a large number of vehicles.

another vehicle).  And third, evidence was presented at the hearing on the Motion to

Suppress that there had been other bank robberies in the Denver metropolitan area in

the past where GPS tracking devices had been thrown out of vehicles or destroyed, such

that the robbers could no longer be tracked, making the officers' decision to act sooner

rather than later more reasonable.  Given these factual circumstances, the Court declines

to second-guess the officers' decision to stop the twenty vehicles when they did.  *See*

*Ryburn v. Huff*, 132 S. Ct. 987, 992 (2012) ("[R]easonableness must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight and . . . the calculus of reasonableness must embody allowance for the fact that

police officers are often forced to make split-second judgments – in circumstances that

are tense, uncertain, and rapidly evolving.") (internal quotations and brackets omitted).

Even though the initial stop was justified, however, [t]his is not . . . the end of a

*Terry* analysis.  Although the seizure was reasonable at its inception, we must determine

whether it was reasonable as conducted."  *United States v. Perdue*, 8 F.3d 1455, 1462

(10th Cir. 1993).  Applying the statement of law from *Edmond*, the question turns to

whether the roadblock was "appropriately tailored."  *Id.*  Or, stated another way, the

analysis turns to the third *Brown v. Texas* factor – "the severity of the interference with

individual liberty."  *Lidster*, 540 U.S. at 427 (quoting *Brown v. Texas*, 443 U.S. 47, 51

(1979).  The Court proceeds to address the ultimate length and invasiveness of the traffic

stop at issue.

**B.      The Invasiveness and Duration of the Stop**

In his briefs, argument presented at the evidentiary hearing, and examination of

witnesses at the hearing, Defendant's primary focus has been on the invasiveness and

duration of the stop, which Defendant alleges amounted to a "mass arrest."  (ECF No.

16, at 9-15.)  In arguing that the mass arrest was unconstitutional, Defendant has not

only emphasized the invasiveness and duration of the stop on his own individual

liberties, but also the effect of the stop on the other twenty-eight some stopped

individuals.[15]

### 1.    Invasiveness

There are no bright-line rules demarcating the difference between a *Terry*-stop

(requiring reasonable suspicion) and an arrest (requiring probable cause).  However,

---

[15] There is at least a mild tension in the law regarding the relevance of the effect of the stop on the other twenty-eight individuals.  On the one hand, certain cases have held that individuals cannot normally assert the constitutional rights of others.  *See, e.g.*, *United States v. Valdez Hocker*, 333 F.3d 1206, 1208 (10th Cir. 2003) ("Fourth Amendment rights are personal and cannot be claimed vicariously.  It is immaterial if evidence sought to be introduced against a defendant was obtained in violation of someone else's Fourth Amendment rights.") (citation and quotation marks omitted); *cf. Camacho v. Brandon*, 317 F.3d 153, 159 (2d Cir. 2003) ("A plaintiff may assert the constitutional claims of a third party if the plaintiff can demonstrate:  (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) some hindrance to the third party's ability to protect his or her own interests.").  On the other hand, cases addressing the constitutionality of roadblocks, in considering "the severity of the interference with individual liberty," necessarily consider at least the policy implications of the impact of roadblocks on the liberties of innocent individuals.

On a related matter, the Court notes that the leading case in which the Supreme Court held a roadblock to be unconstitutional – *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) – was a civil class action seeking declaratory and injunctive relief against the practice of implementing the challenged roadblocks.  Here, however, we have a single-defendant criminal action in which the defendant emphasizes the invasiveness of the traffic stop on all of the stopped individuals, and in so doing seeks the suppression of evidence in the case against him.  One could reasonably argue that a multi-plaintiff 42 U.S.C. § 1983 action would be the more appropriate way to challenge the overall impact on the other twenty-eight individuals of the APD officers' actions in this case.

Erring on the side of caution, however, the Court will consider both the invasiveness and duration of the stop as it affected Defendant himself, and the overall invasiveness of the stop on the twenty-nine individuals involved.

the law in the Tenth Circuit makes clear that, given sufficient exigent circumstances, a *Terry*-stop can involve invasive techniques by officers that would normally resemble traditional arrest.  In *United States v. Perdue*, 8 F.3d 1455 (10th Cir. 1993), for example, the Court held that officers acted reasonably in effecting a *Terry*-stop that involved pointing their weapons at the suspect and ordering him to lie face down on the ground. *Id.* at 1461-63.  In so doing, the Court highlighted "the recent trend [in the law] allowing police to use handcuffs or place suspects on the ground during a *Terry* stop.  Nine courts of appeals, including the Tenth Circuit, have determined that such intrusive precautionary measures do not necessarily turn a lawful *Terry* stop into an arrest under the Fourth Amendment."  *Id.* at 1463 (citing cases); *see also United States v. Shareef*, 100 F.3d 1491, 1502 (10th Cir. 1996) ("The use of firearms, handcuffs, and other forceful techniques does not necessarily transform a *Terry* detention into a full custodial arrest – for which probable cause is required – when the circumstances reasonably warrant such measures.  Such measures are warranted, however, only if the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate.").

Under the particular circumstances here – most important of which was the fact that officers were attempting to apprehend a dangerous criminal who had just robbed a bank at gunpoint minutes before – the Court holds that the mass detention involved did not amount to an "arrest" under Fourth Amendment jurisprudence, but instead remained an investigatory "stop" throughout (for all individuals but Defendant).  As for Defendant himself, he was properly arrested based on probable cause when he was put in the back of an APD patrol car.  That probable cause is discussed in further detail below, in

discussing the justification for the search of Defendant's SUV.

The question remains, however, whether the invasive techniques used by officers on Defendant and the other twenty-eight individuals involved were reasonable. There is little doubt in the Court's view that the invasiveness with which twenty-seven individuals – the ones who were not acting suspiciously – were removed from their vehicles is the most troubling aspect of the APD officers' actions in this case. Every single vehicle was approached as a "high-risk traffic stop," including approaching the vehicles with weapons drawn and shields deployed, ordering the occupants out of the vehicles, and, in some cases, handcuffing vehicle occupants. These types of actions were certain to "generat[e] concern or even fright on the part of lawful travelers." *Martinez-Fuerte*, 428 U.S. at 558.

The Court questions whether such invasive techniques were necessary to use on all twenty vehicles, as opposed to, for example, only the two vehicles in which occupants were observed moving around inside their vehicles and otherwise acting suspiciously. However, the fact of the matter is that the officers had only very vague suspect information, such that it was reasonable to err on the side of caution and assume that the robber could be any of the stopped adults.[16] Further, the fact that the Court questions whether less invasive measures could have been utilized is, under the

---

[16] Defendant has emphasized this fact to support his argument that it was unreasonable for officers to engage in the techniques they did without suspicion of any particular individual. However, in the Court's view, that fact cuts both ways. With no specific information regarding which of the twenty vehicles contained the suspect, it can be argued that it was reasonable to effect the same techniques on all twenty vehicles. Also, as the Government argues, to hold otherwise would be to reward Defendant for having robbed the bank and departed the scene without witnesses being able to offer any identifying information of the suspect to the APD.

circumstances, unwarranted second-guessing of the officers' actions here, given that

they were attempting to apprehend a dangerous felon in real time.  As the Court stated

in *United States v. Tilmon*, 19 F.3d 1221 (7th Cir. 1994):

> [P]olice should, of course, use the least intrusive means reasonably
> available to verify or dispel their suspicions in a short period of time.
> Nevertheless, the fact that the protection of the public might, in the
> abstract, have been accomplished by less intrusive means does not, by
> itself, render the search unreasonable.  When effecting a *Terry* stop,
> which is always a stop made at close range, police officers must make a
> quick decision about how to protect themselves and others from possible
> danger.  They are not necessarily required to adopt alternative means to
> ensure their safety in order to avoid the intrusion involved in a *Terry*
> encounter.  A court in its assessment should take care to consider
> whether the police are acting in a swiftly developing situation, and in such
> cases the court should not indulge in unrealistic second-guessing.

*Id.* at 1225-26 (citations, quotation marks, ellipses, and brackets omitted).  The Court is

to some extent troubled by the overall invasiveness of the traffic stop, but not enough so

to hold that the officers' overall actions were unconstitutional under the circumstances.

The Court also believes it appropriate to emphasize that officers did have

sufficient suspicion of Defendant in particular to remove him from his vehicle using

invasive tactics.  Despite orders to remain still, Defendant was seen moving erratically

inside his vehicle and looking around.  Also, despite orders to put his hands up through

his driver's side window, Defendant was seen moving his hands back inside his vehicle.

Under these circumstances, officers without a doubt were justified in their decision to

order Defendant out of his vehicle at gunpoint, order Defendant to lie on the ground,

and handcuff him.  This form of detention did not amount to an arrest of Defendant, but

was simply a continuation of the investigative stop, and was reasonable.  *See Perdue*, 8

F.3d at 1461-63; *Shareef*, 100 F.3d at 1502.

**2.     Duration**

In terms of the duration of the stop, the evidence indicates that the stop of all

individuals (other than Defendant) lasted for approximately one hour and forty-five

minutes.  Specifically, the stop occurred at 4:01 p.m., and individuals were finally

allowed to return to their vehicles at approximately 5:38 p.m.  They remained in their

vehicles for a short period of time while a Crime Scene Investigator took photographs of

the entire area, and then were allowed to leave.  Defendant argues that the detention

was unreasonably long, and constituted an arrest of all twenty-nine individuals.

An investigative detention "must not exceed the reasonable duration required to

complete the purpose of the stop."  *United States v. Rice*, 483 F.3d 1079, 1082 (10th

Cir. 2007).  "On assessing whether a detention is too long in duration to be justified as

an investigative stop, we consider it appropriate to examine whether the police diligently

pursued a means of investigation that was likely to confirm or dispel their suspicions

quickly . . . ."  *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

The Court finds that the length of the detention, although out of the ordinary in

terms of its length, was not so long to make it unreasonably under the circumstances.

The primary reason for this decision is based on the finding that police officers acted

reasonably in waiting until the handheld beacon, along with an expert trained in its use,

arrived on the scene.  Waiting until this occurred meant that officers would very likely be

able to definitively identify the bank robber.  Also, Lieutenant Lertch was faced with an

ever-changing situation regarding the handheld beacon.  First, he was told that it would

arrive in approximately 20-30 minutes.  Then he was told that it would be another 20-30

minutes.  Then Officer Acierno arrived on the scene, but could not use the beacon

effectively.  It was not until Trooper Williams finally arrived on the scene that a positive

identification was made.  These delays were caused more by resource-related and

distance issues (or a lack thereof), and less by any true lack of diligence by officers,

particularly Lieutenant Lertch and his subordinates.  As Defendant argues, that makes

this case similar to cases in which courts have upheld the reasonableness of traffic

stops that included significant delays, for example, due to the need to get a drug-sniffing

dog on scene.  *See, e.g.*, *United States v. Frost*, 999 F.2d 737, 741-42 (3d Cir. 1993)

(upholding eighty minute detention for drug-sniffing dog to arrive on scene); *United*

*States v. Hbaiu*, 202 F. Supp. 2d 1177, 1182-85 (D. Kan. 2002) (upholding one hour

and forty-five minute detention because "the delay [was] attributable to a number of

circumstances that were outside of the troopers' control").[17]

Defendant consistently emphasizes that, in the Supreme Court checkpoint cases,

the Supreme Court has emphasized that the stops of all motorists must be brief.  *See,*

*e.g.*, *Illinois v. Lidster*, 540 U.S. 419, 427-28 (2004) (emphasizing that stops must be

brief to question motorists for information about fatal hit-and-run accident).  The Court

agrees, but this case is distinguishable.  This is not a case where hundreds, or even

---

[17] If Lieutenant Lertch had been informed from the outset that it would take nearly an hour-and-a-half for an expert in the use of the handheld beacon to arrive on the scene, the reasonable course may have been to let traffic go at that point, and attempt to continue to follow the signal.  That is not the situation presented here, however.  The evidence indicated that the delays took place in stages.  Lertch was first informed that the device would arrive within 20-30 minutes.  Waiting that long for the device to arrive was reasonable.  Lertch was then informed that it would be another 20-30 minutes. Waiting that additional period was also reasonable.  Lertch then learned that Acierno was not exceptionally skilled in the use of the device.  However, the additional delay between Acierno's arrival and Williams's arrival also does not warrant a finding of unreasonableness.

thousands, of vehicles pass through a checkpoint to determine, for example, if any of the motorists have been drinking.  This was a much more narrowly tailored roadblock in which a dangerous criminal who had just committed an armed robbery was known to be within a group of twenty cars.  Those circumstances, along with the events causing the delays in getting the handheld beacon on scene, made the length of the detention here reasonable.

Ultimately, the Court holds that, despite the invasiveness and duration of the stop not only for Defendant but for all of the individuals involved, but also balancing the governmental interests in catching the bank robber and making sure the robber did not harm any innocent civilians, the officers' actions were sufficiently reasonable under the Fourth Amendment such that suppression of the evidence ultimately found in Defendant's SUV is not warranted.[18]

## C.    Probable Cause to Search Defendant's SUV

Defendant actually does not present any argument that probable cause did not exist at the time that he was put in the back of the patrol car or at the time that his SUV was searched.  Instead, Defendant relies entirely on the argument that the evidence obtained is tainted by the preceding "arrest" of Defendant when he was pulled out of his SUV at gunpoint and handcuffed without probable cause.  As the Court has held above,

---

[18] At oral argument, Defendant's counsel discussed the alleged far-reaching implications of a Court ruling on the Motion to Suppress in favor of the Government, by mentioning the hypothetical of a known dangerous criminal entering a large sports complex containing thousands of people who are ultimately "seized" in some way in order to catch the criminal.  The Court concedes that such a case would be a far different one, but counsel's hypothetical is not before the Court.  Based on the particular, and actual, facts and circumstances present here, suppression is not warranted.

the officers' actions in removing Defendant from his SUV at gunpoint, handcuffing him, and detaining him for an extended period of time were reasonable under the Fourth Amendment.  Therefore, suppression based on Defendant's fruit-of-the-poisonous tree argument is unwarranted.

Also, the Court has little trouble concluding that probable cause existed (1) to arrest Defendant at the time officers put Defendant in the back of the patrol car, and (2) to search his SUV at the time officers conducted the search.  When those events occurred, Trooper Patrick Williams, an expert in using the handheld beacon (which was reliable and accurate when used by an expert), had already gotten a "very strong" positive signal that the GPS tracking device was located in Defendant's SUV.  Also, several officers, via a plain-view search through Defendant's closed passenger-side window, clearly witnessed the bank money band on Defendant's front passenger seat.[19] Further, officers also knew that Defendant was one of the few individuals (among the twenty-nine) who had acted suspiciously during the initial stop, warranting Defendant's

_____

[19] The Government's Response brief contains a section arguing that the plain-view doctrine authorized the officers to look through Defendant's car window and view the money bank band.  (ECF No. 18, at 21.)  Defendant failed to respond to this argument in his Reply.  The plain-view doctrine, as traditionally applied, is actually not applicable in this case, because officers did not seize the money band directly following their observation of the money band through Defendant's car windows. *See United States v. Angelos*, 433 F.3d 738, 747 (10th Cir. 2006) (stating that "[t]he 'plain view' doctrine allows a law enforcement officer to seize evidence of a crime" if certain circumstances are met).  However, principles underlying the "plain-view doctrine" are present here.  Specifically, officers were authorized to look through Defendant's closed car windows in order to attempt to observe evidence of the bank robbery.  And the bank money band was incriminating evidence that Defendant may have committed the robbery.  Thus, probable cause to search the vehicle was sufficiently supported in part by the officers' lawful discovery of the bank money band sitting on Defendant's front passenger seat.

early removal from his SUV.  Under these circumstances, probable cause to arrest

Defendant and search the SUV clearly existed.  *See United States v. Grubbs*, 547 U.S.

90, 95 (2006) ("Probable cause [to conduct a search] exists when there is a fair

probability that contraband or evidence of a crime will be found in a particular place.")

(internal quotations omitted); *United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir.

2010) ("Probable cause to arrest exists where, under the totality of the circumstances, a

reasonable person would believe that an offense has been committed by the person

arrested.") (internal quotation marks omitted).[20]

**D.     Defendant's Statements to Officers**

---

[20] The fact that Sergeant Braunlich had obtained Defendant's consent to search the SUV at that point is inconsequential.  Regardless of whether or not Sergeant Braunlich had obtained Defendant's consent to search the SUV, the SUV would have been searched based on the probable cause that otherwise existed.  *See United States v. Sanchez*, 608 F.3d 685, 691 (10th Cir. 2010) (in explaining the inevitable discovery doctrine, the Court stated, "To succeed in suppressing [evidence], [the defendant] must show the discovery [of the evidence] would not have come to light *but for* the government's unconstitutional conduct.") (emphasis in original) (internal quotations omitted).

Although the parties have not so argued, the Court also believes the inevitable discovery doctrine has a broader application in this case.  Taking a step back, there is no doubt that the invasiveness of the techniques used by the officers in removing twenty-seven of the twenty-nine individuals from their vehicles is the more troubling aspect of this case.  On the other hand, it is the Court's opinion that the initial stop and the duration of the stop, given the circumstances, were clearly constitutional.  In addition, the Court believes that the inevitable discovery doctrine properly applies here. Even assuming that the forcible removal of the twenty-seven individuals from their vehicles was unconstitutional, that constitutional violation was not the reason officers were able to establish probable cause to search Defendant's vehicle.  *See id.* ("To succeed in suppressing [evidence], [the defendant] must show the discovery [of the evidence] would not have come to light *but for* the government's unconstitutional conduct.").  In other words, regardless of how invasive the stop was or was not, officers were justified in stopping the twenty vehicles and detaining Defendant until the handheld beacon and Trooper Williams arrived on the scene.  At that point, given the facts presented here, it was inevitable that the officers were ultimately going to obtain probable cause to search Defendant's vehicle.

Defendant also moves to suppress the statements he made to officers – specifically Sergeant Braunlich – regarding consent to search the SUV and the presence of two loaded weapons in the SUV, arguing that the statements must be suppressed under both the Fourth and Fifth Amendments to the Constitution. (ECF No. 16, at 15-19.) In response, the Government focuses only on Defendant's statement to Sergeant Braunlich regarding the presence of weapons in the SUV, arguing that Sergeant Braunlich's pre-*Miranda* query of Defendant regarding firearms was permissible under the public-safety exception to the *Miranda* rule. (ECF No. 18, at 19-21.)

The Court agrees that these statements of the Defendant must be suppressed as obtained in violation of Defendant's Fifth Amendment rights.[21] Building from the foundational case of *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court in *United States v. Edwards*, 451 U.S. 477 (1981), held that "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484.[22] Here, when police first questioned

---

[21] Because of this conclusion, the Court need not reach the question of whether the statements should be suppressed under the Fourth Amendment.

[22] Defendant asserts that he was "in custody" for purposes of *Miranda* and *Edwards*, a point the Government does not dispute. The Court agrees. In *United States v. Perdue*, 8 F.3d 1455 (10th Cir. 1993), the Court held that a suspect was in custody for purposes of *Miranda*, even though he had not been arrested but had only been subjected to a *Terry* stop, because of the use of force and handcuffs as part of his detention. In so holding, the Court stated, "a person has been taken into police custody whenever he 'has been deprived of his freedom of action in any significant way.' . . . [A]

28

Defendant regarding whether he would consent to a search of his vehicle, the evidence

indicates that Defendant unequivocally stated that he wanted to speak with an attorney.

Rather than cutting off further interrogation of Defendant until his lawyer was present,

Sergeant Braunlich later asked Defendant whether he had any weapons in the SUV,

and continued to ask him whether he would consent to a search of his SUV.[23]  This

violated Defendant's Fifth Amendment rights, and so statements that Defendant made

in response to this further questioning must be suppressed.  *See Edwards*, 451 U.S. at

484.

The Government's sole argument, that the public-safety exception applies here,

lacks merit.  As stated in *New York v. Quarles*, 467 U.S. 649 (1984), an officer may

---

suspect can be placed in police 'custody' for purposes of *Miranda* before he has been 'arrested' in the Fourth Amendment sense."  *Id.* at 1463-64 (quoting *Miranda*, 384 U.S. at 444).

[23] Some testimony indicates that at the time Sergeant Braunlich conducted his questioning, Sergeant Braunlich already knew that Defendant had requested to speak to his attorney.  However, even if Sergeant Braunlich did not have actual notice of this fact, he was on constructive notice of the fact.  *See Arizona v. Roberson*, 486 U.S. 675, 687 (1988) ("[W]e attach no significance to the fact that the officer who conducted the second interrogation did not know that respondent had made a request for counsel.  In addition to the fact that *Edwards* focuses on the state of mind of the suspect and not of the police, custodial interrogation must be conducted pursuant to established procedures, and those procedures in turn must enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel.").

Also, although the Government does not argue to the contrary, the Court concludes that all of this questioning constituted "interrogation" for purposes of *Miranda* and *Edwards*.  *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("[T]he term 'interrogation' under *Miranda* refers . . . to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.").

question a suspect in custody without first giving *Miranda* warnings if the questions arise out of "an objectively reasonable need to protect the police or the public from any immediate danger associated with a weapon."  *Id.* at 659 n.8.  The public-safety exception applies not only to interrogation that occurs prior to the giving of *Miranda* warnings, but also applies to interrogation that occurs after a suspect has requested to speak to an attorney.  *See United States v. DeSantis*, 870 F.2d 536, 541 (9th Cir. 1989). For the public-safety exception to apply, the officer at a minimum "must have a reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it."  *United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009) (internal quotations omitted).

In the two cases cited by the Government, significant exigency existed that warranted pre-*Miranda* questioning as to the presence of firearms.  Specifically, in *DeJear*, the questioning took place while the suspect and other individuals were still in their car, and where the suspect had stuffed something next to his car seat and had refused a request to show his hands.  And in *United States v. Lackey*, 334 F.3d 1224 (10th Cir. 2003), at the time of the questioning, the suspect – who was suspected of illegally discharging a firearm – had already been handcuffed by officers but had not yet been patted down for weapons.  In both of the situations presented in those cases, the questioning was necessary to ensure the safety of the officers involved.

Here, however, the evidence indicates that Defendant was handcuffed and in a location significantly removed from his SUV when he was questioned about the presence of firearms in his vehicle.  Unlike *DeJear*, Defendant was not still in his

vehicle, and unlike *Lackey*, the concern was not that Defendant had a weapon on his person. With the multitude of heavily armed officers on site, there was no realistic risk of Defendant being able to regain access to any weapons in his vehicle. Also, the evidence indicates that officers had already fully "secured the scene" with respect to Defendant's SUV at the time of the questioning at issue, with a multitude of heavily armed officers already having conducted secondary searches of the vehicles. Thus, there was also no realistic risk that, for example, someone else was still hiding in Defendant's SUV or that some accomplice among the pedestrian onlookers could have gained access to the inside of the SUV. Under the circumstances present here, the public-safety exception did not apply to Sergeant Braunlich's query regarding the presence of firearms in Defendant's SUV.

The Court, however, agrees with the Government that this conclusion does not warrant the suppression of any evidence found in the SUV (as opposed to the suppression of Defendant's statements). Even absent Defendant's statement regarding the presence of weapons in the SUV, the officers had probable cause to search Defendant's SUV, and the evidence indicates that they would have conducted that search pursuant to the probable cause that existed. And during the search, the firearms would have been located regardless of whether or not Defendant had made any statement regarding their presence in the SUV. *See United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) ("The inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it.") (internal citations and quotations omitted).

## IV.  CONCLUSION

In accordance with the foregoing, the Court hereby ORDERS as follows:

(1)     Defendant's Motion to Suppress Evidence and Statements (ECF No. 16) is

GRANTED IN PART and DENIED IN PART.

(2)     Defendant's Motion is GRANTED in that Defendant's statements to officers will

be SUPPRESSED as obtained in violation of the Fifth Amendment;

(3)     In all other respects, including as to all evidence obtained during the search of

Defendant's vehicle, Defendant's Motion is DENIED; and

(4)     All deadlines and a trial date will be re-set via separate order of the Court.


Dated this 23rd day of October, 2012.

BY THE COURT:

William J. Martínez
United States District Judge